IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

CAROLE DIQUOLLO,                    )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        1:13cv00502  (LMB/TRJ)
                                    )
PROSPERITY MORTGAGE                 )
    CORPORATION,                    )
                                    )
            Defendant.              )

NOV 20 2013

## MEMORANDUM OPINION

Before the Court is defendant Prosperity Mortgage

Corporation's Motion for Summary Judgment.  For the reasons that

follow, defendant's motion will be granted.

### I.    BACKGROUND

Defendant Prosperity Mortgage Company ("Prosperity" or

"Defendant") has moved for summary judgment as to both counts of

the First Amended Complaint ("FAC"), which alleges in Count I

sex discrimination in violation of Title VII, 42 U.S.C. § 2000e,

et seq., and in Count II age discrimination in violation of the

Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.[1]

---

[1] The First Amended Complaint also included a third count, for
common law breach of contract.  It is uncontested that DiQuollo
was an at-will employee of Prosperity.  On October 15, 2013,
DiQuollo voluntarily dismissed Count III.

Except where indicated, the following facts are uncontested.[2] See Prosperity's Statement of Undisputed Facts; Joint Written Stipulation of Uncontested Facts; DiQuollo's Statement of Genuine Issues of Material Facts. Plaintiff Carole DiQuollo ("DiQuollo" or "Plaintiff") was 67 years old when she left Prosperity's employment. In 2000, DiQuollo began working for Prosperity as a home mortgage loan officer in Northern Virginia. DiQuollo was 57 years old when she was hired and admittedly did not encounter any age or sex discrimination in the hiring process.

Prosperity is a joint venture between Long & Foster Companies and Wells Fargo Bank. Under its business plan, Prosperity places loan officers in Long & Foster real estate offices where they have access to Long & Foster realtors. Prosperity's loan officers attempt to establish relationships with Long & Foster realtors to secure their lending business for residential real estate mortgages on the homes sold by the realtors. Mortgages secured by Prosperity's loan officers are then referred to Wells Fargo for underwriting. Although Long & Foster realtors are not required to refer clients to Prosperity's loan officers, loan officers assigned to a Long & Foster office have exclusive access to the realtors in that

_____

[2] Facts relevant to DiQuollo's breach of contract claim (Count III) have been omitted.

office.  The officers are also encouraged to generate loans from outside sources.

As a Prosperity loan officer, DiQuollo met with potential borrowers, qualified them for loans, ran credit checks, gathered information from borrowers required by Wells Fargo for loan applications, and attended closings.  DiQuollo also prospected for business with the Long & Foster realtors in the office and other potential referral sources, including realtors in other firms.  A Prosperity loan processor located in Prosperity's headquarters in Chantilly, Virginia helped support plaintiff's work.  Plaintiff handled other administrative tasks herself. DiQuollo worked at Long & Foster real estate offices in Vienna, Great Falls, and McLean, with her last office being the Elm Street office in McLean, Virginia (the "McLean Office").  All of DiQuollo's office transfers were voluntary and requested by her in an effort to increase her opportunity for additional loan business.

Prosperity measures its loan officers' success at capturing mortgage business from the Long & Foster realtors by measuring the officers' "market share."  For example, if 100 homes were purchased through a particular Long & Foster office in a year and the Prosperity loan officer assigned to that office handled mortgages for 25 of those home purchases, the loan officer's market share for that year would be 25%.

3

In 2006, market share became a priority for Prosperity and each year Prosperity would set market share targets for its loan officers.  These targets were applied to all Prosperity loan officers and the market share targets were well known to all loan officers, who received reports tracking their monthly and year-to-date market share.[3]  DiQuollo's first-level manager, Brian Pawsat ("Pawsat"), discussed market share in weekly conference calls with his team, and Pawsat's manager, Gene Allue ("Allue"), reviewed market share with his larger team in monthly meetings.  Both Prosperity and Long & Foster provided financial incentives to reward those employees who achieved their market share goals.

In July 2007, DiQuollo was disciplined for altering loan records to make it appear that she was responsible for loans with which she actually had no involvement.  DiQuollo admits that she committed the offense, that it was wrong, and that she could have been terminated for what she did.  She qualifies her admission by explaining that other employees engaged in the same

---

[3] Although DiQuollo does not explicitly dispute these facts, she argues that Prosperity did not in fact apply market share targets equally to its loan officers as it "withheld judgment on some loan officers who did not meet their market share" depending on the amount of time that a loan officer worked in a particular Long & Foster office.  Pl.'s Mem. at 7, Ex. 21 at 119.

activity "because of the unreasonable market share requirement of defendant."

It is undisputed that in 2008 plaintiff continued to have problems meeting her market share. As a result, Pawsat gave DiQuollo a written performance evaluation for that year, rating her overall performance a "2" out of a possible "5," meaning that DiQuollo needed "improvement." Pawsat also gave DiQuollo an individual rating of "2" for her market share and indicated that DiQuollo "struggled with market share over the past year." DiQuollo's market share had declined from 14.7% in 2007 to 11.0% in 2008 while the overall Northern Virginia market share grew from 15.6% in 2007 to 19.4% in 2008.[4] In 2008, the Long & Foster office where DiQuollo worked as a loan officer was ranked eighteenth out of twenty Northern Virginia offices.[5]

In 2010, DiQuollo received another "2" rating, this time for her performance in 2009; however, her individual market share rating was downgraded to a "1" ("unsatisfactory") even though her market share had increased from 11.0% in 2008 to

---

[4] DiQuollo does not explicitly dispute these facts, but points out that "Paul Gale, DiQuollo's Broker at McLean Elm Street said DiQuollo was the best agent he ever had in his office." Def.'s Mem. at 8, Ex. 24 at 14-15.

[5] Of the two offices with lower market share, one had only ten loans for the entire year and the other had a new loan officer, Chris Johnson, who had arrived at that office in the middle of 2008.

12.3% in 2009.  DiQuollo's market share was still well below her
2007 market share, and well below the overall Northern Virginia
market share, which had grown to 20.6%.  In 2009, the Long &
Foster office where DiQuollo worked was ranked seventeenth out
of twenty Northern Virginia offices.

     In late 2009, Allue, plaintiff's second-level supervisor,
decided that plaintiff had to be removed from the McLean office
because of her inability to make market share.  She was replaced
in March 2010 by Allison Olweiler, a woman in her thirties.
DiQuollo was not fired; instead, Allue made her an independent
loan officer.  Under that arrangement, DiQuollo was not assigned
to a Long & Foster office, but was expected to work out of her
home, in which she had a desk, a Prosperity-owned laptop, a cell
phone, and a printer.  There is no dispute that DiQuollo had
worked from home at least periodically, on nights and weekends,
while working for Prosperity.  Under this new arrangement,
Prosperity continued to provide DiQuollo with the exact same
technology support as she had when she worked in the McLean
office and she was allowed to use the printer at the McLean
office (at least on weekends).  Moreover, it is undisputed that
DiQuollo retained access to the contacts she had developed in
the McLean office, and if DiQuollo had 26% of an agent's
business in the last year, she could continue working with that

agent. DiQuollo's successor, Olweiler, handled all the other business in the office.

DiQuollo objected to being removed from the Long & Foster office because she strongly believed that she needed a traditional work environment to be successful. See Defendant's Memorandum in Support of its Motion for Summary Judgment ("Def.'s Mem."), Ex. 1 (Deposition of Carole DiQuollo) at 220.

In June 2010, less than three months after she left the McLean office, DiQuollo resigned from Prosperity and immediately began working for SunTrust Bank in a position comparable to that of an independent loan officer. Although DiQuollo had office space at SunTrust, she did not have exclusive access to realtors in a particular real estate office, as she had in the McLean office. After her resignation, DiQuollo was eligible for rehire by Prosperity but never applied. During oral argument, DiQuollo estimated that her income at SunTrust was about half of what she earned at Prosperity.

DiQuollo filed charges of employment discrimination based on sex and age with the Equal Employment Opportunity Commission ("EEOC") in November 2010. The EEOC issued a Notice of Right to Sue on January 29, 2013. Plaintiff timely filed this action on April 25, 2013.

II.     DISCUSSION

A. Standard of Review

Summary judgment is appropriate when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "pointing out to the district court [] that there is an absence of evidence supporting the nonmoving party's case," after which the nonmoving party must "go beyond the pleadings" and present specific facts to establish a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986).  In going beyond the pleadings, "the non-moving party may not rely upon mere allegations" and "his response must, with affidavits or other verified evidence, set forth specific facts showing that there is a genuine issue for trial." Graham v. Geneva Enters., 55 F. App'x 135, 136 (4th Cir. 2003) (per curiam).

Although the court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009).  Rather, when "the record taken as a whole could not lead a rational trier of fact

8

to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks omitted).  Further, in employment discrimination actions, it is not the role of the court to "sit as a super-personnel department weighing the prudence of employment decisions." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005) (internal quotation marks omitted).

  B. Analysis

    For DiQuollo's discrimination claims to survive Prosperity's motion, she must either rely on direct evidence that discrimination motivated Prosperity's decision to remove her from the McLean office or, if there is no direct evidence of discrimination, proceed using the indirect method to prove unlawful discrimination.

    The indirect method requires that a plaintiff first establish a prima facie case of discrimination.  To establish a prima facie case of sex discrimination, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment.  Gerner v. Cnty. of Chesterfield, Va., 674 F.3d 264, 266 (4th Cir. 2012) (citing

White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004)).

To establish a prima facie case of unlawful age discrimination, a plaintiff must show that (1) she is a member of the protected class; (2) she was qualified for the job and met her employer's legitimate expectations; (3) she was subject to an adverse employment action despite her qualifications and performance; and (4) following the adverse employment action, she was replaced by a substantially younger individual with comparable qualifications. Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 513 (4th Cir. 2006).

If the plaintiff establishes a prima facie case of either sex or age discrimination, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. Mereish v. Walker, 359 F.3d 330, 334 (4th Cir. 2004). The employer's burden at this stage "is one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (internal quotation marks omitted). If the employer meets this burden, "the presumption of discrimination created by the prima facie case disappears from the case" and the plaintiff must prove that the "proffered justification is pretextual." Mereish, 359 F.3d at 334; see also Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

**Direct Evidence of Discrimination**

There is no direct evidence of sex discrimination; however, the parties vigorously dispute whether there is direct evidence of age discrimination.  The bases for that dispute are plaintiff's claims that in January 2011, after Allue left Prosperity, he told plaintiff he was directed to remove her from the McLean office and replace her with a younger female and that he agreed to sign an affidavit to that effect, but then refused to sign to avoid retaliation by defendant.  DiQuollo claims in her affidavit and deposition that Allue offered this assistance while her discrimination charges were pending before the EEOC.

Although Allue admits that he did offer to help plaintiff, he strenuously denies making the statements plaintiff describes or offering to provide DiQuollo with evidence of discrimination in support of her EEOC claims; rather, he insists that he only offered to provide evidence that plaintiff was a profitable loan officer.  See Deposition of Eugene W. Allue ("Allue Dep.") at 73-75.  In his deposition, Allue stressed that if he had signed the affidavit, "it would be perjury." Id. at 99.  He also testified that DiQuollo knew that the affidavit was fraudulent and knew that Allue had never made the statements included in the affidavit.  Id. at 109.

Prosperity correctly argues that plaintiff's purported direct evidence of discrimination is not the kind of evidence

11

that can survive a motion for summary judgment because it is unreliable and inadmissible hearsay.  Plaintiff cannot avoid summary judgment on speculative evidence.  Here, the only evidence of Allue making the alleged statements and then refusing to sign the affidavit is plaintiff's uncorroborated testimony.  Although she argues that the unsigned affidavit corroborates her view of what Allue said, the lack of Allue's signature on the document is equally corroborative of Allue's sworn deposition testimony denying that he ever made the statements or agreed to sign that affidavit.

Moreover, the affidavit itself contains significant factual errors as well as language sounding much more like a self-serving brief than a recitation of facts by a witness, which undercuts plaintiff's claim that the affidavit reflects statements actually made by Allue.  For example, the affidavit refers to Paul Gale as one of Allue's "superiors."  FAC Ex. 3 at ¶ 6.  In fact it is undisputed that Paul Gale was not one of Allue's superiors; he was Long & Foster's manager for the McLean office and not a Prosperity employee.  Def.'s Mem. at 6; Allue Dep. at 34-39; Plaintiff DiQuollo's Amended Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem.") at 4.  In paragraph 7 of the affidavit, Allue allegedly states that Prosperity and Long & Foster "encouraged other co-workers of mine to devise a plan to get Ms.

DiQuollo out of the office in order for a younger person to be hired as her replacement." FAC Ex. 3 at ¶ 7. If Allue was cooperating with plaintiff and wanted to support her discrimination claim, why would he not have given her the names of these co-workers who could have then corroborated this statement? No such corroboration has been presented.

Further, Allue testified in his deposition that he was the person who made the decision to remove plaintiff from the McLean office. See Allue Dep. at 83 ("I was the one that took her out of the office. She was always talking about somebody else. And I was always curious about that."); see also id. at 44 (stating that "it was my decision" to remove plaintiff from the McLean office). Plaintiff, again, has presented no evidence to counter Allue's account. For example, there is no evidence that any other Prosperity official takes responsibility for the decision to remove plaintiff from the McLean office.

Lastly, the affidavit recites a clearly self-serving, conclusory statement about plaintiff's state of mind that strongly undermines the probative value of this document:

> It was obvious that this bias [sic] treatment by
> management caused Ms. DiQuollo to experience severe
> emotional distress to the point that she had no choice
> but to feel forced to resign from her position at
> Prosperity in order to seek employment with another
> employer.

FAC Ex. 3 at ¶ 9.  Even if the affidavit had been signed by Allue, this last paragraph would have been inadmissible.

Plaintiff tries to rescue this affidavit by arguing that it is admissible as a party admission under Fed. R. Evid. 801(d)(2)(D).  Plaintiff further argues that summary judgment should not be granted on this record because the conflict between plaintiff and Allue's version of these issues raises credibility issues which cannot be considered in a summary judgment proceeding.  DiQuollo also argues that because Prosperity defended Allue at his deposition, any statements he may have made about unlawful discrimination practices are admissible to establish direct evidence of such discrimination. Pl.'s Mem. at 18-20.  Prosperity properly responds that all the statements plaintiff ascribes to Allue were made after he left defendant's employ and, therefore, do not constitute a party admission.  Def.'s Mem. at 13-14.

As a former employee, Allue's statements are not party admissions, and no other qualification or exception applies which would make his statements admissible.  See Bryant v. Yorktowne Cabinetry, Inc., 538 F. Supp. 2d 948, 953 (W.D. Va. 2008) (finding that statements made by former employees after termination of their employment cannot constitute party admissions under Fed. R. Evid. 801(d)(2)(D)); Bouygues Telecom, S.A. v. Tekelec, 473 F. Supp. 2d 692, 695 (E.D.N.C. 2007)

(holding that Fed. R. Evid. 801(d)(2)(D) "allows for statements to be admissible where there is a requisite showing of an agency or other similar continuing direct relationship between the employer and the individual making the statement").

What Allue was willing to do or say is unclear on this record.  Most importantly, however, Allue's sworn deposition testimony amply demonstrates that he was unwilling to endorse the statements included in the draft affidavit attached to DiQuollo's First Amended Complaint and the lack of his signature on that document corroborates that testimony.

The Court's conclusion that Allue's alleged statements and the unsigned affidavit do not constitute evidence of discrimination does not turn on the credibility of competing witnesses; it is not the lack of credibility that undermines DiQuollo's claim of direct evidence, but the lack of any such evidence.  The law is well established that uncorroborated, self-serving testimony of a plaintiff is not sufficient to create a material dispute of fact sufficient to defeat summary judgment. Auto. Fin. Corp. v. EEE Auto Sales, Inc., No. 1:10CV1407, 2011 WL 2580399, at *5 (E.D. Va. June 28, 2011) (self-serving affidavit plainly insufficient to present any genuine issue of material fact) (citing Fed. R. Civ. P. 56(e), Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996), Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th

Cir. 1988)).  If this Court were to find that an unsigned affidavit from a person who has adamantly insisted under oath that he never made the statements described in the affidavit sufficed to create a dispute of material fact, summary judgment proceedings would become acts of futility.  Simply put, a plaintiff's uncorroborated claim that someone said something, supported only by an unsigned affidavit attributing those statements to that person and adamantly disavowed under oath, is not evidence of anything.

For these reasons, the Court finds that plaintiff lacks any direct evidence of age discrimination, and she must proceed using the indirect method of proof.

**Indirect Evidence of Discrimination**

There is no dispute that DiQuollo is a member of the protected classes at issue (female and over the age of forty) or that she was replaced by a younger woman with comparable qualifications.  Prosperity also does not dispute that removing plaintiff from the McLean office and making her an independent broker constituted an adverse employment action.[6]  Plaintiff has,

---

[6] Notwithstanding defendant's concession, it is unclear whether DiQuollo's change in status from a loan officer assigned to a particular office to an independent loan officer qualifies as an "adverse employment action."  See, e.g., Gordon v. Gutierrez, No. 1:06cv00861, 2007 WL 30324, at *8 (E.D. Va. Jan. 4, 2007) aff'd, 250 F. App'x 561 (4th Cir. 2007) (collecting cases where the Fourth Circuit has declined to hold various reassignments to

therefore, satisfied the first and third elements of the prima facie case for both sex and age discrimination, and she has also satisfied the fourth element of her age discrimination claim because her replacement was substantially younger.

The parties vigorously dispute whether DiQuollo satisfies the second element required for both discrimination claims; that is, that she was in fact performing her job duties to Prosperity's satisfaction. As to the sex discrimination claim, the parties also dispute whether similarly situated male employees received more favorable treatment.

Citing DiQuollo's weak performance evaluations for 2008 and 2009 based on her low market share, Prosperity argues that DiQuollo cannot establish a prima facie case of either sex or age discrimination because she cannot show that she was meeting Prosperity's legitimate business expectations. Def.'s Mem. at 15-17; see also Allue Dep. at 109 (testimony that DiQuollo "was never removed from the office because of her age. It was because of her market share."). It is undisputed that DiQuollo was falling short in a critical area of her employment, and she cannot demonstrate that from Prosperity's point of view she was fulfilling her employer's legitimate expectations. See King v.

---

be adverse employment actions). A plaintiff's "subjective dissatisfaction with her work assignments is not actionable when it produce[s] no detrimental effect on the terms or conditions of her employment." Id.

17

Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (quoting Evans, 80 F.3d at 960-61)).

DiQuollo responds by arguing that similarly situated male employees were treated more favorably, pointing to five male co-workers with low market shares, none of whom were removed from a Long & Foster office and required to work from home. Pl.'s Mem. at 22.

The following chart collects the market share statistics of DiQuollo and her proffered male comparators:[7]

|  | Market Share | |
| --- | --- | --- |
|  | 2008 | 2009 |
| DiQuollo | 11.0% | 12.3% |
| Johnson | 9.2% | 12.6% |
| Blizniak | 29.7% | 16.8% |
| Gamlem | 17.7% | 18.6% |
| Shahriari | N/A | 18.1% |
| Scott[8] | N/A | N/A |

Given these undisputed statistics, it appears that DiQuollo has not established the disparate treatment she alleges. With one exception, each of the men had a better market share than DiQuollo in both 2008 and 2009 (or had no market share to

---

[7] The ages of these proffered comparators are not included in the record. Accordingly, this evidence is relevant only to plaintiff's sex discrimination claim.

[8] According to Allue's declaration, Scott did not work for Prosperity in 2008 and there were only three or four months of data for him in 2009. See Def.'s Mem., Ex. 3 at ¶ 6.

compare, making them irrelevant for purposes of this analysis).
As to Johnson, who was the only male loan officer with a lower
market share than plaintiff, that lower share was only in 2008.
Moreover, it is uncontested that the 2008 number represents his
work in a new, historically underperforming office where he
worked for only part of a year, and that his previous
performance in another office was 41.8%.  In 2009, Johnson
improved his market share to 12.6%, which was slightly higher
than plaintiff's performance.

There is also uncontested evidence in the record that
Prosperity removed at least one[9] male loan officer, Tony Garcia,
from a Long & Foster office because he was not meeting
Prosperity's expectations as to market share.  Garcia was moved
to Prosperity's e-mortgage office at its headquarters in
Chantilly, where – unlike plaintiff after her removal from the
McLean office – he did not have in-person interaction with
either home buyers or realtors.

---

[9] In his declaration, Allue indicates that another male loan
officer, Bill Malkoun, was removed from his office because of
poor market share and disagreements with real estate brokers.
See Def.'s Mem., Ex. 3 at ¶ 7; see also Allue Dep. at 133
(testifying that Prosperity "made several moves with Bill
[Malkoun].  I moved him from the Burke office to the Lorton
office.  Then I moved him from the Lorton office to the
Centreville office, and then I removed him from the Centreville
office and didn't give him an office.").

DiQuollo argues that Garcia is not a proper comparator because he was in his thirties at the time he was removed from his office; DiQuollo asserts that her "claim is that males over the age of 40 or closer in age to plaintiff were not removed from their office [sic] required to work from their homes." Pl.'s Mem. at 22-23.  DiQuollo's argument that Garcia is not a proper comparator because he was in his thirties is unavailing – for purposes of the sex discrimination analysis it is enough that he is not a member of DiQuollo's <u>sex</u>, regardless of his age.

Given the undisputed evidence that DiQuollo was not meeting Prosperity's legitimate expectations regarding market share, she has failed to establish the second required element of a <u>prima facie</u> case of discrimination.[10]  Moreover, the absence of any evidence establishing that underperforming male loan officers were treated more favorably than DiQuollo, as well as the evidence that at least one underperforming male loan officer, Garcia, was also removed from a Long & Foster office, defeat her ability to establish the fourth element of a <u>prima facie</u> case of sex discrimination.  Plaintiff also fails to establish the

---

[10] This is true notwithstanding DiQuollo's arguments that she was – in the opinion of Paul Gale – "the best in-house loan officer" Gale had ever had in his office.  <u>See</u> Pl.'s Mem., Ex. 21 at 43; Ex. 24 at 15.  Gale was employed by Long & Foster, not Prosperity.

fourth element of a sex discrimination claim because she was
replaced by a woman - an individual within her protected class.
See Miles v. Dell, Inc., 429 F.3d 480, 488 (4th Cir. 2005)
(stating that "replacement within the protected class gives rise
to an inference of non-discrimination with respect to the
protected status.  The fourth prong requires plaintiffs, as part
of their prima facie case, to eliminate this inference of non-
discrimination.")).

**Pretext**

Even if DiQuollo could establish a prima facie case of
either sex or age discrimination, Prosperity argues that she
cannot show that Prosperity's reason for removing her from the
McLean office - her poor market share - was pretextual.
DiQuollo does not dispute the statistics showing her poor market
share and acknowledges that market share was an important part
of employment as a loan officer with Prosperity; however, she
maintains that her market share was improving in late 2009 and
that she was producing significant revenues in 2010, implying
that Prosperity's decision to remove her for her poor market
share performance must be a pretext for discriminatory conduct.

There is uncontroverted evidence that DiQuollo's market
share increased in late 2009 and early 2010, and that for the
last month of 2009, her market share was 27.8%.  Pl.'s Mem. at
Exs. 13, 16.  DiQuollo was also awarded the "Wells Fargo Top 10%

21

Sales Award" for December 2009.  Pl.'s Mem. at Ex. 17.   In February 2010, DiQuollo was made a "Partner in Profit" and it appears she was also awarded a bonus.  Pl.'s Mem. at Ex. 11.   In March 2010, the month she was removed from the Long & Foster office in McLean, DiQuollo's market share was 27.27%; her year-to-date market share for 2010 (that is, the first quarter of the year) at that time was 17.86%.  Pl.'s Mem. at Exs. 2, 12.   And in May of 2010 – two months after her removal and a month before her resignation – DiQuollo earned a bonus for her 38% market share in the Long & Foster office in McLean.  Pl.'s Mem. at Ex. 19.

It is also undisputed that before any of these improvements, the decision had already been made to remove DiQuollo from the McLean office and have her work as an independent loan officer.  See Def.'s Mem. at 6, Ex. 2 at 40-44 (Allue's testimony that the decision was made to remove DiQuollo in late 2009, but that she would be given the remainder of the year to improve her performance); Pl.'s Mem., Ex. 1 at 153 (DiQuollo's testimony that "the definitive decision was made in December of 2009").  Further, it is undisputed that plaintiff's improved market share after she was removed from the McLean

office establishes that she had a viable future with Prosperity as an independent loan officer.[11]

It is uncontested that DiQuollo underperformed in both 2008 and 2009, and that it was at the end of 2009 that the decision was made to remove her from the McLean office. It is also undisputed that although DiQuollo was a profitable loan officer, the relevant measure of performance was market share and not, as plaintiff argues, the production of "significant revenues."[12] Further, any improvements in plaintiff's market share for the first quarter of 2010 indicate nothing about what her market share performance might be for the second, third, or fourth quarters, or her overall performance for 2010.

In employment discrimination actions, it is not the role of the court to "sit as a super-personnel department weighing the prudence of employment decisions." Anderson, 406 F.3d at 272. Faced with two years of poor market share statistics, it was not unreasonable for Prosperity to have decided it was time for a change and that the change it made had nothing to do with

---

[11] This further undermines the contention that plaintiff's removal from the McLean office and "reassignment" as an independent loan officer constitutes an "adverse employment action." See note 7, supra.

[12] See Allue Dep. at 128 ("So if you're looking at market share, she was not performing. But, on the other hand, if you're talking about pricing loans, selling loans, and making the company money, she was doing an excellent job.").

plaintiff's age or sex and everything to do with her market share. Given that, DiQuollo has again failed to carry her burden to establish that Prosperity's proffered reason for making the employment decision complained of was pretextual, and for that reason her discrimination claims fail as a matter of law.

**Constructive Discharge**

Both Count II (age discrimination) and the dismissed Count III (breach of contract) include allegations that DiQuollo was constructively discharged or terminated by Prosperity. See FAC ¶¶ 38, 43. Under Fourth Circuit law, "an employee is constructively discharged if an employer deliberately makes the working conditions of the employee intolerable in an effort to induce the employee to quit." Whitten v. Fred's, Inc., 601 F.3d 231, 248 (4th Cir. 2010) (quoting Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353-54 (4th Cir. 1995)) (internal quotation marks omitted). Thus, a plaintiff must prove "(1) deliberateness of the employer's actions and (2) intolerability of the working conditions." Id.; see also Mickens v. Lockheed Martin Corp. Mission Sys. & Sys. (MS2), No. 1:11CV1117, 2012 WL 2673148, at *2 (E.D. Va. July 5, 2012) aff'd, 501 F. App'x 266 (4th Cir. 2012).

Prosperity first argues that under binding case law, discrimination alone (absent additional aggravating factors)

24

does not ordinarily rise to the level of "intolerable"
conditions.  Prosperity further argues that DiQuollo cannot
establish any motivation on its part to make her working
conditions intolerable because of her sex or age.  This is
particularly true given the undisputed fact that both Pawsat and
Allue wanted DiQuollo to continue working at Prosperity and
their efforts to assist her in continuing her work for
defendant.  Def.'s Mem. at 20-21.

Prosperity points out that following her removal from the
McLean office, DiQuollo was able to work with realtors at the
Long & Foster office in McLean with which she had relationships
and continued to have access to the McLean office for meetings
and appointments,[13] technology support, and a loan processor.
Prosperity provided her with marketing support, including
issuing her new business cards and setting up voicemail with an
auto paging function.  Lastly, plaintiff remained eligible for
rehire following her resignation.[14]  As defendant argues,

---

[13] See Pl.'s Mem. at Ex. 18 (April 6, 2010 e-mail from DiQuollo
asking if it would "be all right [sic] if I spend a few hours
one day a week at the office?"; Allue responded "I would say if
you have an appointment to meet with one of your agents, or an
appointment to meet with one of their/your clients then it would
be ok to be there for the appointment.").

[14] See Allue Dep. at 104 ("She was never fired, she quit.  She
could have been assigned to another office.  If another office
had opened up and she wanted that and she'd interviewed for it,
she probably would have gotten it.  There was no ban on Carole

"[t]hese are hardly the actions of a company bent on forcing someone to quit." In sum, Prosperity argues that removing DiQuollo from the McLean office and directing her to work from home did not amount to constructive discharge. Def.'s Mem. at 21. DiQuollo offers no substantive argument in response.

On this record, DiQuollo cannot make a good-faith argument that she was constructively discharged. Therefore, Prosperity prevails on this claim.

### III.  CONCLUSION

For the reasons stated above, Prosperity's Motion for Summary Judgment will be GRANTED by an appropriate Order to be issued with this Memorandum Opinion.

Entered this $\cancel{20}$ day of November, 2013.

Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge

---

DiQuollo. But her stay in [the] McLean [office] had to come to an end because she no longer had a working relationship with the broker and her market share was going down."), 109 ("She was never fired.  I wanted to keep her with Prosperity Mortgage. She was a valuable employee and there was no reason for her to leave.  And she was not banned from getting another office.  She had plenty of opportunities in the future."), 156 ("If another office had opened and she wanted it, she could have interviewed for it, and she could have had that office.  We had offices - we had about 10 offices open a year.").